IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBERT I. HICKS,                                :
                                                :
        Plaintiff,                              :
                                                :
    v.                                          :
                                                :
PAUL G. CLARK, PATTY POWELL, KAREN              :        C.A. No. 05-445-GMS
VENEZKY, JOSEPH REDA, GEORGE                    :
SMILEY, BILL BELL, and TIMOTHY                  :
SHELDON, all individually and in their official :
capacities as members of the NEW CASTLE        :
COUNTY COUNCIL, and NEW CASTLE                  :
COUNTY, a Municipal Corporation,               :
                                                :
        Defendants.                             :

PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION TO STAY

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiff

Dated:  October 3, 2005

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS.................................................................1

SUMMARY OF THE ARGUMENT................................................................................1

STATEMENT OF FACTS.............................................................................................2

    A.    The Parties.............................................................................................2

        1.    Plaintiff Robert I. Hicks...................................................................2

        2.    Defendants...................................................................................2

    B.    Plaintiff's Protected Political Beliefs and Associations (Counts II, III, IV)............2

        1.    The General Election......................................................................2

        2.    The Primary Election......................................................................3

        3.    Defendants' Resultant Anger and Hostility Towards Plaintiff...................3

    C.    Prima Facie Case of Racial Discrimination (Count V)............................................3

    D.    Plaintiff's Protected Speech (Counts I, III, IV)......................................................3

        1.    The Content of Plaintiff's Speech..............................................................4

            a.    Exposure of County Council's Illegal Expenditure of $15 Million....................................................................................4

            b.    Exposure of Violation of County Laws by a High Ranking County Official........................................................................4

            c.    Exposure of Illegal Business Practices............................................4

            d.    Recommendation to the General Assembly on Proposed Legislation.................................................................................5

            e.    Report of Illegal Interference in County Auditing Process by County Officials.................................................................5

            f.    Recommendation for Change in County Practices..........................5

*i*

          g.      Recommendation That a Risk Assessment Audit be Performed.....5

          h.      Audit Exposing an Improper $1.5 Million Contract.......................6

          i.       Exposure of Illegal Contract Renewal Actions...............................6

    2.       Speech Not Required By Plaintiff's Job Duties...........................................6

          a.       Speech to the Delaware Media.........................................................6

          b.      Speech to the Citizens of New Castle County and the Public.........7

          c.       Speech to the Attorney General's Office.........................................7

          d.      Speech to the Delaware General Assembly.....................................7

          e.       Speech to Others.............................................................................7

    3.       Defendants' Resultant Anger and Hostility Towards Plaintiff...................8

E.      Plaintiff's Protected Activity Under the Delaware Whistleblowers'
       Protection Act, 19 Del.C. § 1701 <u>et. seq.</u> (Count VI)................................8

F.      The Illegal Firing of Plaintiff.....................................................................8

G.     Causal Evidence.........................................................................................9

    1.       Plaintiff's Political Beliefs and Associations.............................................9

    2.       Plaintiff's Race.........................................................................................9

    3.       Plaintiff's Speech and Whistleblowing.....................................................10

H.     Plaintiff's Injuries That Will Be Exacerbated By a Stay of This Case.................10

ARGUMENT.....................................................................................................................11

I.       THIS CASE SHOULD NOT BE STAYED BECAUSE THE PENDING
        SUPREME COURT CASE HAS NO BEARING ON THREE OF THE
        FOUR PRIMARY LEGAL THEORIES PRESENTED AND TO THE
        EXTENT IT TOUCHES ON A PORTION OF PLAINTIFF'S FREE
        SPEECH THEORY, THAT SPEECH WILL STILL BE ACTIONABLE
        UNDER THE STATE WHISTLEBLOWER THEORY....................................11

A.    The Basics...................................................................................11

B.    The Factors.................................................................................12

    1.    The Pending Supreme Court Case Will Not Have a Dispositive Effect On This Case....................................................12

        a.    Our Case Presents Four Distinct Legal Theories...............12

        b.    Free Speech Retaliation.....................................................12

            (i).    Plaintiff's Speech to the County Executive and County Council May Be Impacted by the Pending Supreme Court Case.........................13

            (ii).    But Plaintiff's Speech to the Media, the Attorney General's Office, the General Assembly and the Public Will Not Be Impacted.................................................................13

        c.    State Whistleblowers' Retaliation.....................................14

        d.    Political Belief and Association Retaliation......................14

        e.    Race Discrimination...........................................................15

        f.    Summary............................................................................15

    2.    Judicial Economy is Not Served by Staying This Case................15

    3.    The Public Welfare Will Not Be Served by Delaying This Case......................................................................................16

    4.    Plaintiff Will Be Prejudiced by the Stay.......................................17

C.    Summary....................................................................................18

II.    THE CRIMINAL PROCEEDINGS INVOLVING NON-DEFENDANTS GORDON AND FREEBERY ARE NOT PARALLEL TO THIS CASE AND THERE IS NO SUBSTANTIVE OVERLAP BETWEEN THE TWO MATTERS.....................................................................................18

A.    The Six Factor Test....................................................................18

*iii*

1.      The Issues Do Not Overlap............................................................19

      a.      Mentions of Their Names in the Complaint......................19

      b.      The Required Analysis Under Plaintiff's Legal
             Theories...............................................................................20

           (i).      Free Speech Retaliation.........................................20

           (ii).     Political Belief and Association Retaliation..........21

           (iii).    Race Discrimination................................................21

           (iv).    Whistleblower Retaliation.....................................22

      c.      There is No Overlap With the Criminal Case....................22

2.      Status of the Criminal Proceedings................................................23

3.      Plaintiff's Interests.........................................................................23

4.      Burden on Defendants....................................................................23

5.      The Court's Interests......................................................................24

6.      The Public Interest.........................................................................24

7.      Summary.........................................................................................24

CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975)....................................................................17

Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997) (en banc)......................................20

Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001)...............................................12-14,16,20

Bechtel Corp. v. Local 215, 544 F.2d 1207 (3d Cir. 1976)...........................................................11

Bhatangar v. Surrendra Overseas Ltd., 52 F.3d 1220 (3d Cir. 1995).........................................17

Buckley v. Valeo, 424 U.S. 1 (1976).........................................................................................16-17

Clinton v. Jones, 520 U.S. 681 (1997).....................................................................................11,18

Connick v. Myers, 461 U.S. 138 (1983).......................................................................................20

Darchia v. Ashcroft, 101 Fed.Appx. 373 (3d Cir. 2004)..............................................................21

DeVita v. Sills, 422 F.2d 1172 (3d Cir. 1970)..............................................................................24

Feldman v. Phila. Hous. Auth., 43 F.3d 823 (3d Cir. 1994).....................................................13-14

Gold v. Johns-Manville Sales Corp., 723 F.2d 1068 (3d Cir. 1983)........................................11-12

Goodman v. Pa. Turnpike Comm'n, 293 F.3d 655 (3d Cir. 2002).............................................12,21

Grutter v. Bollinger, 539 U.S. 306 (2003).....................................................................................12

Kunda v. Muhlenberg College, 621 F.2d 532 (3d Cir. 1980)........................................................17

Landis v. North American Co., 299 U.S. 248 (1936)................................................................11-12

Louisiana v. U.S., 380 U.S. 145 (1965).........................................................................................17

Maloney v. Gordon, 328 F.Supp.2d 508 (D.Del. 2004) ..........................................................19,22

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).......................................................21-22

Michael v. Ghee, 325 F.Supp.2d 829 (N.D.Ohio 2004)...........................................................12,15

*v*

Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)...........................................14,21

Pickering v. Board of Educ., 391 U.S. 563 (1968).........................................................................14

Rockwell Tech, LLC v. Spectra-Physics Lasers, Inc., 2002 WL 531555
    (D.Del. March 26, 2002)......................................................................................................22

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)....................................................22

U.S. v. Breyer, 41 F.3d 884 (3d Cir. 1994)............................................................................11,18

U.S. v. Kemp, 365 F.Supp.2d 618 (E.D.Pa. 2005).......................................................................16

U.S. v. Kordel, 397 U.S. 1 (1970)..............................................................................................24

U.S. v. Panarella, 277 F.3d 678 (3d Cir. 2002).........................................................................16

U.S. v. Smith, 776 F.2d 1104 (3d Cir. 1985).............................................................................16

U.S. v. Virginia, 518 U.S. 515 (1996).......................................................................................17

## Constitutions, Statutes and Rules

U.S. Constitution Amendment I...............................................................................................passim

U.S. Constitution Amendment XIV..........................................................................................passim

28 U.S.C. § 1331.......................................................................................................................1

28 U.S.C. § 1343(a)(3).............................................................................................................1

28 U.S.C. § 1343(a)(4).............................................................................................................1

28 U.S.C. § 1367.......................................................................................................................1

28 U.S.C. § 2201.......................................................................................................................1

28 U.S.C. § 2202.......................................................................................................................1

42 U.S.C. § 1981.....................................................................................................................1,12

42 U.S.C. § 1983.................................................................................................................1

Delaware Whistleblowers' Protection Act.............................................................8,12

9 Del.C. § 1183(a)(1)....................................................................................3,9,21

9 Del.C. § 1405(b)...........................................................................................6-7,13

19 Del.C. § 1701 et. seq.......................................................................8,12,14,22

19 Del.C. § 1702(6)b.............................................................................................14

19 Del.C. § 1703....................................................................................................14

19 Del.C. § 1703(2)................................................................................................14

19 Del.C. § 1703(3)................................................................................................14

19 Del.C. § 1703(4)................................................................................................14

## NATURE & STAGE OF THE PROCEEDINGS

This is a civil action for compensatory and punitive damages and for injunctive relief for violations of rights to political belief and association (Count II, III, IV), to be free of race discrimination (Count V), free speech (Count I) and under state whistleblower law (Count VI). Plaintiff was the victim of a spoils system, racial discrimination and whistleblower retaliation whereby he lost his job because of his political party affiliation, and candidate support during the 2004 campaign season, his race and because he exposed financial wrongdoing by high government officials. Seven defendant Democrats acting in an administrative, executive, or managerial capacity violated his rights. (D.I. 1; Compl. ¶ 1 - hereinafter "¶ ___ ").

Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendments to the United States Constitution. The cause of action arises under 42 U.S.C. § 1981 and § 1983. The state law cause of action arises under 19 Del.C. § 1703. This Court has jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367, which provides for supplemental jurisdiction. (¶ 2).

This is plaintiff's Answering Brief in opposition to defendants' Motion to Stay.

## SUMMARY OF THE ARGUMENT

The pending Supreme Court case bears only upon one of plaintiff's four separate and independent legal theories - public employee free speech retaliation. It has no bearing on plaintiff's theories for: (1) political belief and association retaliation; (2) state law whistleblower retaliation; and (3) race discrimination. To the extent that the Supreme Court changes the legal landscapes and rules that speech required by one's job

duties is not protected by the First Amendment, this speech will still be actionable under plaintiff's state law whistleblower theory because plaintiff's speech dealt with financial misconduct.

Additionally, neither Gordon nor Freebery are defendants in this civil case. They are not witnesses to any of the legally relevant facts of this case. Therefore, their indictment has absolutely no bearing on this case. As a result, it would be legal error to stay this civil case pending the outcome of their criminal trial.

## STATEMENT OF FACTS

**A. The Parties.**

**1. Plaintiff Robert I. Hicks.** Plaintiff is an African-American and also a registered Republican. (¶¶ 3, 109, 139). He is an experienced and highly regarded auditor who was hired by New Castle County Council on November 6, 2002. At all times his job performance was outstanding. (¶¶ 25-30, 36-41, 61-62, 70).

**2. Defendants.** Defendants are registered Democrats and high ranking public officials holding elected positions on the New Castle County Council. All are sued both individually and in their official capacities. (¶¶ 4-23). Defendant New Castle County is a municipal corporation organized under the laws of the State of Delaware. (¶ 24).

**B. Plaintiff's Protected Political Beliefs and Associations (Counts II, III, IV).**
Plaintiff is a well known registered Republican. (¶ 109).

**1. The General Election.** In his private life and off duty, plaintiff voted for and openly supported Republican candidates for County offices in the general election

in November 2004.[1]  He voted for and openly supported Ernie Lopez who was the

Republican opponent of defendant Clark for president of County Council in the general

election.  For example, plaintiff's lawn displayed campaign signs supporting Republican

Lopez.  He also distributed campaign literature for Lopez.  Defendants were aware of

this.  (¶¶ 109-111, 3).

       **2.  The Primary Election.**  In the September 2004 Democratic primary

election defendant Clark also was opposed by a Democratic challenger, Council member

Penrose Hollins.  Clark only defeated Hollins by 152 votes.  In his private life and off

duty, plaintiff openly supported Hollins over Clark. (¶¶ 112, 3).

     In his private life plaintiff also supported the reform candidate, Christopher

Coons, in the Democratic primary instead of the candidate defendants preferred.  Plaintiff

posted a yard sign supporting Coons. (¶¶ 113, 3).

       **3.  Defendants' Resultant Anger and Hostility Towards Plaintiff.**  The

individual defendants were aware of plaintiff's protected First Amendment activities and

were antagonized by them. (¶¶ 110, 112-113, 117-118).

      **C.  Prima Facie Case of Racial Discrimination (Count V).**  Plaintiff is an

African-American.  He was well qualified for the position of auditor, and as is discussed

at greater length immediately below, he performed his job in an exemplary manner.

However, plaintiff was fired and then replaced by a lesser qualified white.  (¶¶ 139-142,

25-30, 36-41, 61-62, 70).

      **D.  Plaintiff's Protected Speech (Counts I, III, IV).**  Throughout his

_____

   [1]  State law provides at 9 Del.C. § 1183(a)(1) that plaintiff can not be retaliated against
because of his political affiliation.

employment, plaintiff spoke out and exposed waste, inefficiency, corruption, fraud and illegality in County Council and County government. He sought to bring to light actual or potential wrongdoing or breach of the public trust by County Council and others and to have those wrongs corrected. Because of the great public interest in the subject matter of plaintiff's speech, the media widely reported on and publicized it. (¶¶ 39, 36-38).

      **1. The Content of Plaintiff's Speech.** Plaintiff spoke out about a large number of topics.

      **a. Exposure of County Council's Illegal Expenditure of $15 Million.** On July 20, 2004, plaintiff spoke out to the Attorney General's Office and reported that members of County Council had violated state law and secretly met behind closed doors and illegally spent $15 million of taxpayer monies. The Department of Justice subsequently declared these meetings - and thus the actions taken at them - illegal. (¶ 41(c)). This speech does not relate to the criminal indictment of non-defendants Gordon and Freebery.

      **b. Exposure of Violation of County Laws by a High Ranking County Official.** On August 23, 2004, plaintiff spoke out and exposed that the County Attorney was violating one of the very laws that he was responsible for enforcing. The County Attorney resigned in disgrace soon after. (¶ 41(b)). This speech does not relate to the criminal indictment.

      **c. Exposure of Illegal Business Practices.** On April 19, 2004, plaintiff spoke out and exposed the illegal deeds of County employee Lynn Moroz, which subsequently led to his federal indictment and guilty plea. (¶ 41(f)). This speech does not relate to the criminal indictment of Gordon and Freebery.

4

**d.  Recommendation to the General Assembly on Proposed Legislation.**  In January 2004, plaintiff was invited and spoke out to the General Assembly of the State of Delaware.  Following an invitation from the Chair and Vice-Chair of the Delaware Housing & Community Affairs Committee, plaintiff gave his professional opinion on several legislative matters that would significantly improve state law relating to the Office of County Auditor.  (¶ 41(h)).  This speech does not relate to the criminal indictment.

**e.  Report of Illegal Interference in County Auditing Process by County Officials.**  On April 6, 2004, plaintiff spoke out and reported that numerous County officials (including defendant Venezky) had attempted to interfere with his efforts to conduct the first internal audit department compliance audit.  (¶ 41(g)).  This speech does not relate to the criminal indictment.

**f.  Recommendation for Change in County Practices.**  In May 2004, plaintiff spoke out and recommended several cost-savings strategies related to the filling of long vacant positions rather than the expensive creation of new ones.  (¶ 41(i)).  This speech does not relate to the criminal indictment.

**g.  Recommendation that a Risk Assessment Audit Be Performed.**  In December 2004, plaintiff recommended that Council conduct a risk assessment of the County Finance Department to uncover any misuse of public monies, fraud and other impropriety by the outgoing Gordon and Freebery administration.  (¶ 41(a)).[2]

---

[2]  Despite the mention of their names, this and several other areas of plaintiff's speech cannot fairly be characterized as relating to any of the specific charges in the detailed criminal

**h. Audit Exposing an Improper $1.5 Million Contract.** On April 19, 2004, plaintiff spoke out and issued an audit report, exposing a previously unknown and improper $1.5 million contract benefitting Freebery's brother. (¶ 41(d)). This speech does not relate to the criminal indictment.[3]

**i. Exposure of Illegal Contract Renewal Actions.** On August 16, 2004, plaintiff spoke out and reported that the Executive Branch had secretly modified the contract benefitting Freebery's brother so that it would automatically renew without Council's approval. (¶ 41(e)). This speech does not relate to the criminal indictment.

**2. Speech Not Required by Plaintiff's Job Duties.** Plaintiff's job description only required that he report illegal activity to the County Executive and County Council. (¶ 34). See 9 Del.C. §1405(b) ("If the County Auditor shall at any time discovery any unauthorized, illegal, irregular or unsound practice, he or she shall forthwith lay such facts before the County Executive and the County Council").

However, on numerous occasions, plaintiff spoke out to many persons, organizations and public bodies, in addition to his mandated reports to the County Executive and County Council.[4]

**a. Speech to the Delaware Media.** Plaintiff regularly spoke to

---

indictment of non-defendants Gordon and Freebery.

[3] Defendants admit that the criminal indictment does not deal with this charge. (OB at 16). Nonetheless, they claim that because the indictment does deal with a conflict of interest on another unrelated matter, this somehow entitles them to a stay. (Id.).

[4] Despite defendants' numerous factual misrepresentations to the contrary (see, e.g. OB at 1,5), plaintiff's Complaint never asserts that all of his speech was required by his job duties.

the Delaware media about illegal activities by County government.  For example, plaintiff spoke to and answered questions from the News Journal and WILM radio about Council's illegal expenditure of $15 million of taxpayer monies.  (¶¶ 41(c), 43).  This speech to the news media was not required by his job duties.  (See ¶ 34).  See 9 Del.C. §1405(b).

**b. Speech to the Citizens of New Castle County and the Public.**

Additionally, plaintiff regularly spoke out and reported illegal government actions, such as the County Attorney's illegal actions, directly to the "citizens of New Castle County" and the public.  (¶¶ 41(b), 43).  This speech to the citizens of New Castle County and the public was not required by his job duties.  (See ¶ 34).  See 9 Del.C. §1405(b).

**c. Speech to the Attorney General's Office.**  Plaintiff also spoke out and reported illegal government actions, such as the secret expenditure of $15 million of taxpayer monies, directly to the State Attorney General's Office.  (¶¶ 41(c), 43, 155).  This speech to the Attorney General's Office was not required by his job duties.  (See ¶ 34).  See 9 Del.C. §1405(b).

**d. Speech to the Delaware General Assembly.**  Plaintiff also spoke out to the Delaware General Assembly about proposed legislation related to the strengthening of the County Auditor position.  (See ¶¶ 41(h), 43, 155).  This speech to the General Assembly was not required by his job duties.  (See ¶ 34).  See 9 Del.C. §1405(b).

**e. Speech to Others.**  Plaintiff also spoke out and reported illegal government actions, such as the illegal contract benefitting Freebery's brother, to "other" persons and parties.  (¶¶ 41(e), 43, 155).  This speech to other persons and parties was not required by his job duties.  (See ¶ 34).  See 9 Del.C. §1405(b).

**3. Defendants' Resultant Anger and Hostility Towards Plaintiff.** The individual defendants were aware of plaintiff's protected speech and it greatly antagonized them. (¶¶ 39-40, 7, 10, 14, 17, 19, 21, 23).

**E. Plaintiff's Protected Activity Under The Delaware Whistleblowers' Protection Act, 19 Del.C. § 1701 et. seq. (Count VI).** As discussed above, plaintiff spoke out and reported numerous actions by County Government which were materially inconsistent with and a serious deviation from financial management and accounting standards set forth under both state and county law. These actions by the County violated laws intended to protect the public from fraud, deceit and misappropriation of public funds and assets under the County's control. In speaking out, plaintiff sought to protect the public from fraud, deceit and misappropriation of taxpayer money. (¶¶ 153-154, 158).

**F. The Illegal Firing of Plaintiff.** On January 25, 2005 County Council held a regular legislative meeting that also included an executive session. However, immediately thereafter, Council convened a meeting for the non-legislative purpose of ending plaintiff's employment contract. The agenda for the meeting was posted just one day before on January 24th, and not the more normal seven days in advance. The subject matter of the non-legislative meeting was "discussion of confidential personnel matter." Plaintiff then waived confidentiality of the meeting. (¶¶ 44-48).

John Flaherty, the president of Common Cause of Delaware, was seated in the audience. He publicly protested the meeting and argued that it had not been properly posted and noticed under state law. Defendant Clark threatened to eject Flaherty from the chamber if he persisted in questioning the legality of the meeting. Clark denied the public any opportunity to comment during the meeting. (¶¶ 49-51).

8

Then, on a motion by defendant Clark, which was seconded by defendant Venezky, on Tuesday evening January 25, 2005, plaintiff was unceremoniously fired by County Council by a vote of the seven defendants, which was opposed by five other Council members, with another abstention.  (¶¶ 52).[5]

**G.  Causal Evidence.**  Defendants gave little public explanation for their actions. (¶ 54).  Nonetheless, the record reveals numerous categories of causal evidence, pointing to plaintiff's political beliefs and associations, his race, and his speech as being causes of his discharge.  In the interests of brevity, plaintiff will briefly touch on only some of the evidence.[6]

**1.  Plaintiff's Political Beliefs and Associations.**  One Council member - Jea Street - publicly stated that plaintiff was fired because plaintiff had opposed Clark in the Democratic primary election the prior September.  Street also quoted Clark as stating "I'm the new president, I've got seven votes; I'm going to take him out."  (¶¶ 59-60). Plaintiff also was replaced by a lesser qualified <u>Democratic</u> partisan, not another Republican.  (¶¶ 65, 115).  Notably, State law provides in 9 Del.C. § 1183(a)(1) that plaintiff's employment cannot be terminated because of his political affiliation. (¶ 114).

**2.  Plaintiff's Race.**  The seven members of County Council who voted to fire plaintiff are white. (143).  Councilman Street, who works with the defendants on a

_____

[5]  This action: (a) was administrative, executive, managerial or proprietary; (b) was not an integral step in the legislative process; (c) was not part of the legislative process itself; (d) did not involve policy making of a general scope; (e) was not substantively legislative; (f) was not procedurally legislative; and/or (g) was only casually or incidentally related to legislative affairs. (¶ 53).

[6]  Importantly however, the Complaint is overflowing with causal evidence that the present posture of this case does not require be addressed. (<u>See, e.g.</u> ¶¶ 55-70).

daily basis, publically stated that racial overtones colored defendants' decision to fire plaintiff. Other elected officials, including State Representative Hazel Plant, have publically stated the same. (¶ 147). As previously discussed, plaintiff is an African-American and was performing his job in an exemplary manner. Nonetheless, he was fired and then replaced by a lesser qualified white. (¶¶ 139-142, 70(g)).

       **3. Plaintiff's Speech and Whistleblowing.** The night plaintiff was fired, defendant Clark stated that plaintiff was a lightening rod for controversy (¶ 55), an obvious euphemism for his protected speech. He previously stated that plaintiff had "been too aggressive" in the execution of his auditor duties. (¶ 56). Council then hired a lesser qualified white Democrat and specifically set as a condition his of employment that this lesser qualified individual perform no audits of County Council and must completely ignore the conduct of the legislative branch of County government. (¶¶ 66-69). Clark also has tried to amend state law in a manner that would have statutorily prohibited some of plaintiff speech. (¶¶ 63-64).

    **H. Plaintiff's Injuries That Will Be Exacerbated by a Stay of This Case.**

Plaintiff has suffered numerous injuries because of defendants' illegal actions. (¶ 76). For example, because of the widespread local publication of plaintiff's firing and the slanderous public accusations made about his abilities as an Auditor by various defendants (¶¶ 77-78, 70(e)), his professional reputation has been destroyed and plaintiff was unable to find substitute employment in New Castle County and instead had to secure new employment out of state. (¶¶ 81-82). This job requires more hours, and pays less money. (¶¶ 80, 82). Additionally, because of the long daily commute required to his new employer, plaintiff has lost the ability to work secondary jobs to supplement his

finances. (¶ 83). Even more importantly however, because he no longer works in close proximity to his home and young daughter's school, plaintiff is no longer able to spend the time with his wife and daughter that is so important to him. (See ¶ 80). As a result, plaintiff is also manifesting classic symptoms of anxiety, stress and even depression, such as weight loss and inability to sleep. (¶ 79).

## ARGUMENT

**I.    THIS CASE SHOULD NOT BE STAYED BECAUSE THE PENDING SUPREME COURT CASE HAS NO BEARING ON THREE OF THE FOUR PRIMARY LEGAL THEORIES PRESENTED AND TO THE EXTENT IT TOUCHES ON A PORTION OF PLAINTIFF'S FREE SPEECH THEORY, THAT SPEECH WILL STILL BE ACTIONABLE UNDER THE STATE WHISTLEBLOWER THEORY.**

**A. The Basics.**  A "[c]ourt has broad discretion to stay proceedings as an incident to its power to control its own docket." Clinton v. Jones, 520 U.S. 681, 706-07 (1997).[7] "The power to stay is incidental to the power inherent in every court to dispose of cases so as to promote their fair and efficient adjudication." U.S. v. Breyer, 41 F.3d 884, 893 (3d Cir. 1994).

"A stay is an extraordinary measure," id., and "[t]he proponent of a stay bears the burden of establishing its need." Clinton, 520 U.S. at 708. "In determining whether a stay is appropriate, the court should "weigh [the] competing interests and maintain an even balance." Landis, 299 U.S. 254-55. "It is well settled that before a stay may be issued, the petitioner must demonstrate 'a clear case of hardship or inequity' if there is 'even a fair possibility' that the stay would work damage on another party." Gold, 723

---

[7] Accord Landis v. North American Co., 299 U.S. 248, 254-55 (1936); Gold v. Johns-Manville Sales Corp., 723 F.2d 1068, 1077 (3d Cir. 1983); Bechtel Corp. v. Local 215, 544 F.2d 1207, 1215 (3d Cir. 1976).

F.2d at 1075-76 (quoting Landis, 299 U.S. at 255). "Only in rare circumstances will a litigant be compelled to stand aside while a litigant in another settles the rule of law that will define both." Landis, 299 U.S. at 255.

**B. The Factors.** Citing the Supreme Court's Landis decision, four factors have been identified in the case law to be considered when a court is faced with a motion to stay a case due to a pending appeal to the Supreme Court. See Michael v. Ghee, 325 F.Supp.2d 829, 831 (N.D.Ohio 2004). They are: (1) the potential that the pending appeal will have a "dispositive effect" on the case to be stayed; (2) judicial economy; (3) the public welfare; and (4) hardship or prejudice to the party opposing the stay. Id.

**1. The Pending Supreme Court Case Will Not Have a Dispositive Effect on This Case.** When a pending Supreme Court case has the "potential to be completely dispositive" of another action, the fact will "heavily" weigh in favor of a stay. Id. at 831-32 (emphasis added). Unfortunately for defendants, that is not our present case.

**a. Our Case Presents Four Distinct Legal Theories.** Plaintiff is proceeding on what are, in essence, four legal theories. (1) First Amendment public employee free speech retaliation. See, e.g. Baldassare v. State of N.J., 250 F.3d 188, 195-96 (3d Cir. 2001). (2) Delaware Whistleblowers' Protection Act retaliation. See 19 Del.C. § 1701 et. seq. (3) First Amendment public employee political belief and association retaliation. See, e.g. Goodman v. Pa. Turnpike Comm'n, 293 F.3d 655, 663-64 (3d Cir. 2002). (4) Fourteenth Amendment and 42 U.S.C. § 1981 race discrimination. See, e.g. Grutter v. Bollinger, 539 U.S. 306 (2003).

**b. Free Speech Retaliation.** The pending Supreme Court case

only bears in our case upon one relevant nuance of the public employee free speech retaliation theory under <u>Baldassare</u>.  Although the issue of whether speech required by one's job duties is protected speech is a settled issue in the Third Circuit under <u>Baldassare</u> and <u>Feldman v. Phila. Hous. Auth.</u>, 43 F.3d 823 (3d Cir. 1994), it appears that the Supreme Court has granted certiorari on that issue.

**(i).  Plaintiff's Speech to the County Executive and County Council May be Impacted by the Pending Supreme Court Case.**  The impact on our case is clear.  If the Supreme Court overrules settled Third Circuit precedent in <u>Baldassare</u> and <u>Feldman</u>, then plaintiff's job mandated speech to the County Executive and County Council may no longer be actionable under the First Amendment because 9 Del.C. §1405(b) explicitly requires plaintiff to bring illegal conduct to the attention of those two public bodies.

**(ii).  But Plaintiff's Speech to the Media, the Attorney General's Office, the General Assembly and the Public Will Not be Impacted.** Unfortunately for defendants, because plaintiff did not confine his speech to those two government bodies, this does not end the matter.  As discussed at length in the Statement of Facts at section **D.2.** above, plaintiff also spoke out and reported corruption and wrongdoing to the Delaware news media, the Attorney General's Office, the General Assembly, the citizens of New Castle County and the general public.  Plaintiff's job duties did not require this speech, but plaintiff, as a good and conscientious <u>citizen</u> who was outraged by defendants' complicity in and refusal to fix our broken County government, spoke out and exposed these matters anyway.

Thus, even under the best case scenario for defendants, even if the Supreme Court

decides to add an entirely new 'speech as a citizen' nuance to the long established free speech paradigm under <u>Pickering v. Board of Educ.</u>, 391 U.S. 563 (1968), and <u>Mount Healthy City Bd. of Educ. v. Doyle</u>, 429 U.S. 274 (1977), because plaintiff also spoke out as a citizen, plaintiff's free speech theory will continue and it will not be aborted by the Supreme Court. Here a jury would be asked to decide whether speech to the media, public and other groups was a substantial or motivating cause of the adverse action taken against plaintiff.

   **c. State Whistleblowers' Retaliation.** But the defendants have neglected to mention plaintiff's whistleblowers' claim under 19 Del.C. § 1701, <u>et. seq.</u> This state statute also will protect nearly all of plaintiff's speech, from his reporting of innumerable financial improprieties to County Council and the County Executive, <u>id.</u> at § 1703(4), to his refusal to be complicit in these financial improprieties, <u>id.</u> at § 1703(3), to his speech to the General Assembly. <u>Id.</u> at § 1703(2).

   Thus, even if the Supreme Court overrules <u>Feldman</u> and <u>Baldassare</u> on the speech required by one's job duties issue and plaintiff's speech to the County Executive and County Council is no longer protected, because plaintiff spoke out and reported to his employer actions that were "materially inconsistent with, and a serious deviation from financial management or accounting standards" (¶ 153) and sought to protect the taxpayers "from fraud, deceit, or misappropriation of public funds and assets" (¶ 154), this state law independently protects his whistleblowing activities. <u>See</u> 19 Del.C. §§ 1703, 1702(6)b.

   **d. Political Belief and Association Retaliation.** Defendants again fail to note that the pending Supreme Court case has no bearing on plaintiff's

political belief and association retaliation claims.

        **e.  Race Discrimination.**  In the same way, defendants omit mention that the pending Supreme Court case does not bear on plaintiff's race discrimination theory.

        **f.  Summary.**  Thus, the pending Supreme Court case only has the potential to affect one small portion of plaintiff's free speech retaliation claim, not even all of it.  It has no bearing on plaintiff's claims for political belief and association retaliation, race discrimination or state law whistleblower retaliation.  And even if the Supreme Court case does affect plaintiff's free speech claim, those portions will nonetheless still be actionable under the state whistleblowers law.  Accordingly, the pending Supreme Court case will not have the required totally "dispositive" effect on plaintiff's case required by the case law on stays. <u>Michael</u>, 325 F.Supp.2d at 831.[8]  As a result, this factor weights "heavily" against a stay.  <u>Id.</u>

        **2.  Judicial Economy is Not Served by Staying This Case.**  In the same way, judicial economy also dictates that the stay be denied.  As just discussed, the pending Supreme Court case will have no substantive affect on this case.  Any claims that can no longer be brought under the First Amendment still can be brought under the state whistleblowers law.  And the political association and race discrimination claims likewise also will proceed.  Thus, judicial economy will not be served by staying this case because discovery and trial on all allegations will have to take place regardless.[9]  As a result, this

---

    [8]  Defendants numerous pleas to the contrary are mistaken.  (<u>See, e.g.</u> OB at 7, 10).

    [9]  Thus, defendants are mistaken when they wrongly assert that the pending Supreme Court case will "negate the need for this Court to 'delve in to the vast majority of the legal issues' presented in the Complaint" and will "invalidate or greatly narrow the entire Complaint."

factor also weighs against a stay.

### 3.  The Public Welfare Will Not Be Served By Delaying This Case.

Similarly, the public welfare also tilts in favor of rejecting the stay.  Defendants are high

government officials, elected to the highest legislative positions in New Castle County.  It

is self-evident that the public has a weighty interest in the illegal actions of public

officials such as defendants who have been entrusted with the care of our public affairs.

See Baldassare, 250 F.3d at 197 ("allegations of corrupt practices by government officials

are of the utmost public concern"); id. at 196 ("[d]isclosing corruption, fraud and

illegality in a government agency is a matter of significant public concern").  Indeed, "the

public has a substantial interest in the integrity or lack of integrity of those who serve

them in public office."  U.S. v. Smith, 776 F.2d 1104, 1114 (3d Cir. 1985).

Key to the healthy functioning of our democratic form of government is the ability

of the citizens to see for themselves and judge the action of elected officials such as

defendants.  See U.S. v. Panarella, 277 F.3d 678, 696-97 (3d Cir. 2002) ("Critical to the

health of the electoral process is the voters' ability to judge whether their representatives

are acting to further their own [ ] self-interest instead of the public interest"); Buckley v.

Valeo, 424 U.S. 1, 49 n.55 (1976) ("Democracy depends on a well-informed electorate,

not a citizenry [ ] limited in its ability to discuss and debate candidates and issues").[10]

_____

(OB at 8).

[10]  See also U.S. v. Kemp, 365 F.Supp.2d 618, 634 (E.D.Pa. 2005) ("Official corruption is
a malignant cancer on the body politic, for which prosecution and publicity are strong cures.
Prosecution of public corruption cases must be highly transparent so that the public will be aware
of the governmental transactions at issue, which will allow members of the public to express
opinions and exercise their right to petition and vote based on conclusions reached from the facts
in the public record, regardless of the guilt or innocence of a particular defendant").

Rejecting the stay, and thus conclusively exposing defendant's illegality to the light of day so that it may be remedied is in the public interest. As Justice Brandeis said long ago, sunlight is the best disinfectant. See Buckley, 424 U.S. at 67 ("Sunlight is said to be the best of disinfectants")(quoting L. Brandeis, Other People's Money 62 (National Home Library Foundation ed. 1933)). And if plaintiff's speech has revealed anything, it is that County government is dirty and needs to be cleansed.

Furthermore, granting a stay in this case will allow defendants to send an illicit, yet clear message to other employees who are considering speaking out - 'Oppose us and we will drag things out forever. You may win your court case, but you will lose the war as you struggle to stay afloat financially and hold you and your family together emotionally for many long years.' Prompt disposition of cases such as this one involving important issues related to the public welfare encourages other employees in a position to know to speak out and protect the public from wrongdoing and corruption by those holding elected office. Accordingly, this factor also weighs against a stay.

**4. Plaintiff Will Be Prejudiced By the Stay.** Finally, our Circuit has often noted the "well-worn but nevertheless truthful aphorism that 'justice delayed is justice denied.'" Bhatangar v. Surrendra Overseas Ltd., 52 F.3d 1220, 1228 (3d Cir. 1995). Plaintiff simply cannot be made whole again until this case reaches an end and the violation of his constitutional rights are remedied. See U.S. v. Virginia, 518 U.S. 515, 547 (1996); Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975); Louisiana v. U.S., 380 U.S. 145, 154 (1965); Kunda v. Muhlenberg College, 621 F.2d 532, 549 (3d Cir. 1980). In addition to the significant monetary losses plaintiff has suffered as a result of defendants' illegal firing, plaintiff also has suffered intangible injuries that cannot be

remedied by a delayed back pay award. As discussed above, because of the long

distances that plaintiff is forced to travel for work because defendants so effectively

destroyed his good name in the public eye, plaintiff is being deprived of participating in

the life of his youngest daughter during her formative high school years as well as being

pulled away from the rest of his family. For a dedicated father and husband, this injury is

especially heartbreaking.

Moreover, as more time passes, the memories of key witnesses begin to fade.

Documents could be destroyed. Plaintiff's ability to successfully prosecute his case at

some indeterminate date in the future will be greatly prejudiced as these key sources of

evidence fade away to nothing.

As a result, it is clear that plaintiff will be prejudiced by the stay. As a result, this

factor also weighs against the stay.

**C. Summary.** As discussed above, all four of the factors identified in the case

law weigh against a stay. Accordingly, because defendants have failed to meet their

burden, <u>Clinton</u>, 520 U.S. at 708, of justifying the use of the "extraordinary measure" of a

stay, <u>Breyer</u>, 41 F.3d at 893, defendants' motion to stay this case should be denied.

**II.     THE CRIMINAL PROCEEDINGS INVOLVING NON-DEFENDANTS
          GORDON AND FREEBERY ARE NOT PARALLEL TO THIS CASE AND
          THERE IS NO SUBSTANTIVE OVERLAP BETWEEN THE TWO
          MATTERS.**

**A. The Six Factor Test.** Six factors should be considered in deciding whether to

stay a civil case because of parallel overlapping criminal proceedings: (1) the extent to

which the issues in the civil and criminal cases overlap; (2) the status of the criminal

proceedings, including whether any defendants have been indicted; (3) the plaintiff's

interests in expeditious civil proceedings weighed against the prejudice to the plaintiff

caused by the delay; (4) the burden on the defendants; (5) the interests of the court; and

(6) the public interest.  Maloney v. Gordon, 328 F.Supp.2d 508, 511 (D.Del. 2004).

       **1.  The Issues Do Not Overlap.**  Overlap of issues between the civil and

the criminal case is "the most important threshold issue in determining whether or not to

grant a stay."  Id.  Simply put, there is no substantive overlap whatsoever in this case.

**Gordon and Freebery are not defendants in this case**.  Plaintiff did not sue Gordon or

Freebery for anything they have done.

       **a.  Mentions of their Names in the Complaint.**  First, although

Gordon and Freebery's names do appear in the Complaint, they do not play any

significant role as witnesses  in the resolution of the issues to be decided in this case.

First, their names are mentioned because some of plaintiff's speech touched on actions

taken by non-defendant Gordon and Freebery's troubled administration of County

government. (See ¶¶ 41(a, f, g, i,)).   Notably however, none of plaintiff's speech

addressed matters that are specifically mentioned in the indictment and which are being

tried in criminal court.  Thus, there is no factual overlap between plaintiff's speech and

the matters for which those non-defendants are being prosecuted.

     Second, they are mentioned because four of the seven defendants are their friends.

And that friendship gives those defendants a motive to retaliate against plaintiff - who

exposed some of Gordon and Freebery's illegal conduct.  (See ¶¶ 5-6, 9, 12-13, 16, 70(a),

71(a, c)).  Plaintiff respectfully submits that, as a matter of law, being friends or political

allies with a person who has been indicted does not entitle the friend or ally to a stay of

civil proceedings against them which involve matters which are not issues in that criminal

trial.

Lastly, Gordon and Freebery are mentioned as part of an effort to give the proper context to plaintiff's speech.  (See ¶ 42).  See Connick v. Myers, 461 U.S. 138, 147-48 (1983) (to determine the public concern nature of a plaintiff's speech, you must look at the "content, form, and context of a given statement, as revealed by the whole record").  They are mentioned because, in light of Gordon and Freebery's criminal troubles, the public concern in plaintiff's speech which revealed other illegal activities in County government is dramatically heightened.  Again, this 'context' is not a fact issue in the criminal trial about which Gordon and Freebery could offer to testify in our civil case.

In the same way, as a matter of law, mere temporal overlap between unrelated illegal behavior is insufficient to warrant a stay of civil proceedings.

### b. The Required Analysis Under Plaintiff's Legal Theories.

There simply is no substantive overlap between the facts underlying the legal theories in this case and the facts in the criminal indictment.

(i).  **Free Speech Retaliation.**  Under plaintiff's free speech theory, the only issues that will have to be decided are (1) whether plaintiff spoke out, (2) whether his speech touched on a matter of public concern; and (3) then the disruption balancing.  See Azzaro v. County of Allegheny, 110 F.3d 968, 976 (3d Cir. 1997) (en banc).  There are not complicated matters and will be decided by the Court as a matter of law at summary judgment.  Baldassare, 250 F.3d at 195.  Why defendants believe Gordon and Freebery will need to testify on any of these matters is unknown.  Why defendants assert that Gordon and Freebery will need to assert their Fifth

Amendment privilege also is a mystery.[11]  The only other determinations that will have to

be made under this theory are the causation prongs of the paradigm.  See Mt. Healthy,

429 U.S. at 287.  Here the Complaint at ¶¶ 55-70 identifies the proof that will be offered.

And none of these facts overlap with the criminal case.  Why non-defendants Gordon and

Freebery will be required to testify to defendants' motivations to retaliate against plaintiff

is unknown.  Why they would have to invoke their Fifth Amendment rights also is a

mystery.[12]

> **(ii).  Political Belief and Association Retaliation.**  Under

the political association theory, the only factual issues to be decided are: (1) whether

plaintiff works for a public agency in a position that does not require a political

affiliation;[13] (2) whether plaintiff maintained an affiliation with a political party;[14] and (3)

the Mt. Healthy causal prongs.  See Goodman, 293 F.3d at 663-64.  Non-defendants

Gordon and Freebery's involvement under this theory again is a mystery.  (See ¶¶ 114-

119).  Again, no overlap.

> **(iii).  Race Discrimination.**  Plaintiff's race discrimination

theory is governed by the ever familiar burden shifting paradigm of McDonnell Douglas

---

[11]  This also begs the question of how defendants have standing to assert rights on Gordon
and Freebery's behalf.

[12]  The defense tactic of refusing to offer evidence and then asking this Court to reach
speculative conclusions violates the fundamental requirement that legal "determinations must be
based on evidence in the record, rather than speculation or conjecture."  Darchia v. Ashcroft, 101
Fed.Appx. 373, 376 (3d Cir. 2004).

[13]  A state statute explicitly permitting plaintiff to engage in political activity quickly ends
this inquiry.  See 9 Del.C. § 1183(a)(1).

[14]  This prong should be undisputed.

Corp. v. Green, 411 U.S. 792 (1973), and Texas Dept. of Cmty. Affairs v. Burdine, 450

U.S. 248 (1981).  Plaintiff respectfully submits that non-defendants Gordon and

Freebery's testimony has no bearing on whether defendants were motivated by illicit

racial animus, as one Councilman has already suggested.  (¶ 147).  Nor is the indictment

about race discrimination.

>    **(iv).  Whistleblower Retaliation.**  Lastly, under plaintiff's

whistleblower theory, the only relevant legal issues are whether: (1) plaintiff spoke out

about financial improprieties; and (2) whether plaintiff's speech was the "primary basis"

for his firing.  See 19 Del.C. § 1701, et seq.  Non-defendants Gordon and Freebery's

factual involvement under this theory also is a mystery.

>    **c.  There is No Overlap With the Criminal Case.**  Defendants

have failed to meet their burden of proving factual overlap in the two cases or that

Gordon and Freebery will be witnesses or will have to invoke their Fifth Amendment

rights.[15]  This is not a case where plaintiff's protected speech proximately resulted in the

criminal indictment of the defendants.  See Maloney v. Gordon, 328 F.Supp.2d 508

(D.Del. 2004) (stay of a free speech retaliation action where plaintiffs reported

government corruption to the grand jury which then indicted the defendants, the same

defendants whom plaintiffs sued for retaliatory discharge).  Defendants have presented no

case law where the criminal indictment of an insignificant non-defendant entitles the

actual defendants in a civil case to a stay of that case against them.

---

[15]  Any attempt to add any such evidence or claims in defendants' Reply brief will be met
with a motion to strike for failure to comply with D. Del. LR 7.1.3(c)(2) which forbids illicit
"sandbagging."  Rockwell Tech, LLC v. Spectra-Physics Lasers, Inc., 2002 WL 531555, * 3
(D.Del. March 26, 2002).

As defendants also fail to mention, Gordon and/or Freebery are actual defendants in all of the cases pending before the District Court that have been stayed over the last 15 months.[16]  That is a significant distinguishing factor from our present case.

**2.  Status of the Criminal Proceedings.**  Although the criminal proceedings against Gordon and Freebery are in progress, this factor must be viewed in the context of the plain fact that Gordon and Freebery are not defendants in this case.  Nor are our current defendants under indictment.  Thus, the status of the criminal proceedings is irrelevant to this case.  Defendants have presented no case law where a defendant to a civil case is entitled to a stay of the case because a <u>non-defendant</u> has been criminally indicted in another matter.

The defense assertions that the trial of this civil matter will somehow expose criminal defense strategies and criminal witnesses (OB at 17) are baseless and defendants have offered no evidence to support such unfounded conclusions.  Accordingly, this factor weighs against a stay.

**3.  Plaintiff's Interests.**  As discussed at Argument **I.B.4** above, plaintiff's interests weigh against a stay of these proceedings.  Notably however, a stay until the completion of the never ending criminal proceedings against Gordon and Freebery will result in an even longer delay than simply awaiting the results of the pending Supreme Court case.  Accordingly, plaintiff's interests weigh even more heavily against a stay.

**4.  Burden on Defendants.**  Notably, defendants have not offered any

---

[16]  <u>See</u> <u>Reyes v. Freebery, et al.</u>, C.A.No. 02-1283-KAJ; <u>Maloney v. Gordon and Freebery</u>, C.A.No. 03-999-KAJ; <u>Riddell v. Gordon and Freebery</u>, C.A.No. 04-1201-KAJ; <u>Riddell v. Gordon and Freebery</u>, C.A.No. 04-1211-KAJ.

prejudice or other burden that they would suffer from this case not being stayed. Defendants assert that Gordon and Freebery will be prejudiced unless this case is stayed. (OB at 18). But again, <u>Gordon and Freebery are not defendants in this case</u>. Thus, there is no burden on defendants in our case. Thus, this factor weighs against a stay.

        **5. The Court's Interests.** As discussed at Argument **I.B.2** above, judicial economy is served by the prompt disposition of this case. The defense claim that the Court will have to decide numerous privilege issues (OB at 18-19), also is a red herring. Plaintiff is not calling Gordon or Freebery as witnesses. Defendants have offered no witnesses at all who would assert privilege on issues relevant to the prosecution of this civil case.[17] Accordingly, this factor weighs against a stay.

        **6. The Public Interest.** As discussed at Argument **I.B.3** above, the public interest will not be served by a stay of this case.

        **7. Summary.** The defense argument can be summed up as follows. Gordon and Freebery are being prosecuted for illegality. Some of plaintiff's speech addressed **<u>other</u>** illegality by Gordon and Freebery. Neither Gordon nor Freebery are defendants in this case. Therefore, defendants are entitled to a stay in this case.

        There is a glaring logical disconnect to this argument. Unfortunately for defendants, that logical disconnect reveals that the defense position is meritless.

---

        [17] Assuming *arguendo* that a non-defendant did have privilege concerns, as the Third Circuit has observed, "the contention that an actual or potential defendant in a criminal case should not even be put to the difficult choice of having to assert the privilege in a related civil case was rejected in [<u>U.S. v. Kordel,</u> 397 U.S. 1 (1970)]." <u>DeVita v. Sills</u>, 422 F.2d 1172, 1178-79 (3d Cir. 1970).

## **CONCLUSION**

The defense motion to stay this case should be denied in all respects.


Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**


/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiff

Dated: October 3, 2005

# Unreported Opinions

*Westlaw.*

101 Fed.Appx. 373                                                                                    Page 1
101 Fed.Appx. 373
**(Cite as: 101 Fed.Appx. 373)**

**C**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Viktor DARCHIA, Petitioner,
v.
John ASHCROFT, Attorney General of the United States, Respondent.
No. 03-2217.

Argued March 24, 2004.
Decided June 21, 2004.

**Background:** Alien petitioned for review of a decision of the Board of Immigration Appeals denying his application for withholding of removal and for relief under the Convention Against Torture.

**Holdings:** The Court of Appeals, John R. Gibson, Circuit Judge, held that:

 (1) evidence supported IJ's adverse credibility findings, and

 (2) evidence supported IJ's determination that alien's testimony did not establish a clear probability that his life or freedom would be endangered upon return to Georgia.

 Review denied.

West Headnotes

**[1] Aliens** ☞54.1(4.1)
24k54.1(4.1) Most Cited Cases

**[1] Treaties** ☞8
385k8 Most Cited Cases

Evidence supported Immigration Judge's (IJ) adverse credibility findings regarding an alien seeking withholding of removal and relief under the Convention Against Torture; IJ viewed alien's lack of diligence in pursuing his asylum claim as evidence that he was not in fear for his life, and found implausible alien's story that, although KGB agents beat him, he did not seek medical help because it would have made his situation worse if he was asked how he came to be injured and had to reveal that it was the KGB who beat him; moreover, while the alien stated that his children, whom he left in Georgia, continue to receive threats by telephone, he did not mention this in the 46- paragraph affidavit filed with his asylum application. Immigration and Nationality Act, § 241(b)(3)(A), as amended, 8 U.S.C.A. § 1231(b)(3)(A); 8 C.F.R. § 208.16(c).

**[2] Aliens** ☞54.1(4.1)
24k54.1(4.1) Most Cited Cases

**[2] Treaties** ☞8
385k8 Most Cited Cases

Evidence supported Immigration Judge's (IJ) determination that alien's testimony did not establish a clear probability that his life or freedom would be endangered upon return to Georgia or that he would be tortured, thus defeating his claims for withholding of removal and relief under the Convention Against Torture; alien's wife, a lawyer, testified that the Georgian government could not establish a tie between the alien and an assassination attempt that would support a prosecution, and therefore the government did not pursue the alien further than questioning him on one occasion. Immigration and Nationality Act, § 241(b)(3)(A), as amended, 8 U.S.C.A. § 1231(b)(3)(A); 8 C.F.R. § 208.16(c).

 **\*373** On petition for review of a final order of the Board of Immigration Appeals. File No: A77-440-861.

 Jon Landau (Argued), Erica S. Gonzalez, Baumann, DeSeve & Landau, Philadelphia, Pennsylvania, for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 Fed.Appx. 373
101 Fed.Appx. 373
**(Cite as: 101 Fed.Appx. 373)**

Page 2

Petitioner.

Anthony P. Nicastro (Argued), United States Department of Justice, Office of Immigration Litigation, Washington, DC, David V. Bernal, Ernesto H. Molina, Douglas E. Ginsburg, Lyle D. Jentzer, United States Department of Justice, Office of Immigration Litigation, Ben Franklin **\*374** Station, Washington, DC, for Respondent.

Before: FUENTES, SMITH, and JOHN R. GIBSON, [FN\*] Circuit Judges.

> FN\* The Honorable John R. Gibson, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

OPINION OF THE COURT

JOHN R. GIBSON, Circuit Judge.

Viktor Darchia, a native and citizen of Georgia, petitions for review of the decision of the Board of Immigration Appeals denying his application for withholding of removal and for relief under the Convention Against Torture. Darchia contends that substantial evidence does not support the Immigration Judge's findings (1) that Darchia's testimony was not credible, (2) that Darchia has not suffered past persecution, and (3) that there is no clear probability that Darchia would be persecuted or tortured if he were deported to Georgia. We deny review.

Darchia was admitted to this country in 1998 as a visitor from Georgia with a three-month visa. He overstayed his visa and was placed in removal proceedings. He conceded deportability, but applied for asylum, withholding of removal, and relief under the Convention Against Torture. Darchia failed to apply for asylum within a year of arriving in the United States, so he is ineligible for asylum, *see* 8 U.S.C. § 1158(a)(2)(B), as he now concedes. Consequently, this petition for review is limited to the question of whether Darchia is eligible for withholding of removal because of the likelihood of persecution or torture.

At his hearing, Darchia testified that he has degrees in both history and mechanical engineering. He served as head of the government housing office from 1982 to 1987 and then as head of the Management Board of Technical Inventory for the Housing Department from 1987 until he left voluntarily in 1998. In 1989 he became a member of a political party, the Popular Front, which was in opposition to the government. Darchia served as a regional-level board member for the party. He testified that on several occasions he was beaten by police while he was attending Popular Front public meetings or rallies. At a meeting on September 15, 1992, police hit him with a rubber baton, splitting open his hand and leading to a two-day hospitalization. He was again beaten with a rubber baton at a meeting on October 8, 1993, and again on May 2, 1994. On February 4, 1996, there was a fight between the Popular Front and the party in control of the government; the police allowed the government's party to start a brawl, and Darchia was beaten. He testified that police beat him again at another rally, on April 10, 1997, and that he had to go to a hospital to have his shoulder relocated.

Darchia also testified that he was beaten on another occasion, when men came to his office and took him to the KGB headquarters, where they tried to get him to confess to participating in an attempt to assassinate then-Georgian President Edward Shevardnadze. He said he did not go to a hospital after that beating because it would have only made his situation worse. He said that he received threatening phone calls and that he believed he was under surveillance.

Finally, Darchia testified that when he was leaving the U.S. Consulate in Tbilisi on February 17, 1998, after applying for a visa, he was attacked and beaten.

**\*375** Darchia is married to his second wife. He has two grown children from his first marriage and two minor children from his second marriage. He and his wife applied for visas to go to the United States. He received a visa, though his wife did not. In 1998 he left Georgia and came to the United States after a short stay in Moscow. Darchia's visa expired in December 1998, but he did not go home or obtain permission to remain in this country. His wife obtained a visa to visit

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 Fed.Appx. 373
101 Fed.Appx. 373
**(Cite as: 101 Fed.Appx. 373)**

Page 3

Mexico; once there, she crossed into the United States illegally and joined Darchia in Tennessee in April 1999. Darchia and his wife were picked up at a roadblock in 1999, while on vacation in Arizona. He was given an asylum application form by an Immigration Judge in Arizona, but failed to complete the form. He consulted two different attorneys about applying for asylum, but one attorney was given permission to withdraw from representing Darchia on the ground that Darchia did not cooperate with counsel. Darchia did not file an asylum application until November 9, 2000.

Darchia said he did not know whether Georgian government officials are currently investigating him, but he said that his children, who were left behind in Georgia, continue to receive telephone calls warning Darchia to stop his activities with the Popular Front and threatening him with death. Darchia's evidence consisted principally of his own testimony and asylum application, State Department reports on Georgia, the testimony of his wife, and the testimony of a Georgian asylee who had no independent knowledge of the facts of Darchia's case.

The Immigration Judge did not find Darchia's testimony or that of his witnesses to be credible. Additionally, the Immigration Judge found that Darchia's testimony, even if believed, did not prove that he had been subjected to persecution. Instead, he found Darchia only showed that the police behaved aggressively or even cruelly in keeping order at public demonstrations. Nor did the Immigration Judge find it likely that Darchia would be persecuted if he were to return to Georgia, since he was allowed to retain a lucrative position of authority within the government throughout the time he was involved in political opposition to the government. Finally, the Immigration Judge found that Darchia did not show he would more likely than not be tortured if he returned to Georgia.

The Board of Immigration Appeals affirmed without opinion, pursuant to 8 C.F.R. § 1003.1(e)(4). Darchia filed a timely petition for review, and we therefore have jurisdiction under 8 U.S.C. § 1252 (2000).

Under 8 U.S.C. § 1231(b)(3)(A) (2000), the Attorney General may not remove an alien to a country if the

alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion. The alien bears the burden of proving a "clear probability" that his life or freedom would be threatened in the proposed country of deportation. *INS v. Stevic,* 467 U.S. 407, 429-30, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984); *Tarrawally v. Ashcroft,* 338 F.3d 180, 186 (3d Cir.2003).

Under the regulations implementing the Convention Against Torture, 8 C.F.R. §§ 208.16-208.18, to establish a right to protection, an alien must prove that it is more likely than not that the alien would be tortured if deported to the country proposed. 8 C.F.R. § 208.16(c).

When the Board of Immigration Appeals summarily affirms the decision of the Immigration Judge, we review the Immigration Judge's decision. *Tarrawally,* 338 F.3d at 184. We review the Immigration *376 Judge's findings of fact, including credibility determinations, under the substantial evidence standard. *Id.* Under the substantial evidence standard, we must uphold the Immigration Judge's factual determinations unless "any reasonable adjudicator would be compelled to conclude to the contrary." *Gao v. Ashcroft,* 299 F.3d 266, 272 (3d Cir.2002) (quoting 8 U.S.C. § 1252(b)(4)(B) and *INS v. Elias-Zacarias,* 502 U.S. 478, 483-84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). Adverse credibility determinations must be based on evidence in the record, rather than speculation or conjecture. *Id.*

[1] We conclude that the Immigration Judge's adverse credibility findings are supported by substantial evidence. The Immigration Judge rejected Darchia's various explanations for why he failed to apply for asylum promptly instead of waiting for more than two years. Even though Darchia concedes that his asylum claim is time-barred, the findings are still relevant since the Immigration Judge viewed Darchia's lack of diligence in pursuing his asylum claim as evidence that Darchia was not in fear for his life. The record supports the Immigration Judge's finding of lack of diligence, for example, in Darchia's choice to go on vacation to Arizona rather than attending to his asylum application.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 Fed.Appx. 373                                                                    Page 4
101 Fed.Appx. 373
**(Cite as: 101 Fed.Appx. 373)**

*See Abdulrahman v. Ashcroft,* 330 F.3d 587, 597 (3d Cir.2003) (Immigration Judge's credibility determinations should be upheld if they are grounded in the record and supported by "specific cogent reasons").

   The Immigration Judge also found implausible Darchia's story that, although the KGB agents beat him, Darchia did not seek medical help because it would have made his situation worse if he was asked how he came to be injured and had to reveal that it was the KGB who beat him.   Darchia does not explain satisfactorily why he could not have simply declined to tell the doctors who beat him.   The Immigration Judge found this explanation made "absolutely no sense."   This was a permissible assessment of the record evidence.

   The Immigration Judge also based his assessment of Darchia's credibility on Darchia's statement that his children, whom he left in Georgia, continue to receive threats by telephone, whereas Darchia did not mention this in the forty-six paragraph affidavit filed with his asylum application.   The Immigration Judge could infer that something as serious as threats to one's minor children, left behind on the other side of the world, would have made its way into an affidavit detailing the applicant's fears.   The inference of fabrication was a permissible one.

   We have reviewed Darchia's various other attacks on the Immigration Judge's credibility findings, and we conclude that the findings were based on substantial evidence in the record.

   [2]  Next, Darchia attacks the Immigration Judge's findings that Darchia's testimony did not establish a clear probability that his life or freedom would be endangered upon return to Georgia or that he would be tortured.   The Immigration Judge held that the past incidents in which Darchia was beaten during public demonstrations showed over-aggressive police crowd control measures, rather than persecution.   The Immigration Judge found the possibility of future persecution remote because

   all the while [Darchia] was involved with his political party and during the period of time that he had confrontations with the police and was arrested by the

police, [Darchia] continued in his important positions with the government of Georgia.   He was never dismissed from those jobs.   If, indeed, the government wished **377** to harm him in some fashion, this, I believe, would have been done by removing him from his positions of authority within the government itself.

   Darchia's wife, a lawyer, testified that the Georgian government could not establish a tie between Darchia and the assassination attempt that would support a prosecution and therefore the government did not pursue Darchia further than questioning him on the one occasion.   Her testimony confirms that Darchia was not in continued danger because of the allegation that he participated in the assassination plot.   The Immigration Judge's conclusions were supported by substantial evidence in the record.

   We deny review.

   101 Fed.Appx. 373

   END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.



**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
ROCKWELL TECHNOLOGIES, LLC, Plaintiff,
v.
SPECTRA-PHYSICS LASERS, INC. and Opto
Power Corporation, Defendants.
**No. Civ.A.00-589 GMS.**

March 26, 2002.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

　**\*1** The plaintiff, Rockwell Technologies, LLC ("Rockwell") filed the above-captioned action against Spectra-Physics Lasers, Inc. ("Spectra") and Opto Power Corporation ("Opto") on June 16, 2000. In its complaint, Rockwell alleges that Spectra and Opto are infringing U.S. Patent No. 4,368,098 ("the '098 patent").

　Presently before the court is Rockwell's motion for partial summary judgment. In this motion, Rockwell asks the court to find that the '098 patent is not invalid due to alleged inequitable conduct that occurred in the prosecution of the patent application. For the reasons that follow, the court will grant this motion in part and deny it in part.

II. STANDARD OF REVIEW

　The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Boyle v. County of Allegheny, Pennsylvania,* 139 F.3d 386, 392 (3d Cir.1998). Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle,* 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173-174 (3d Cir.1999).

　With these standards in mind, the court will describe the facts and procedural history that led to the motion presently before the court.

III. BACKGROUND

　A. Prosecution of the '098 Patent

　The patent-in-suit relates to a process for forming "an epitaxial film of group III-V semiconductor disposed on a single crystal substrate." Dr. Harold Manasevit ("Manasevit") developed the process described in the '098 patent. On February 13, 1968, Rockwell filed a patent application with the United States Patent and Trademark Office ("PTO"). As the application contained both process and product claims, the PTO required that Rockwell choose one to proceed with first. Rockwell elected to give precedence to the product claims.

　In 1978, Rockwell retained the law firm of Staas and Halsey to prosecute the Manasevit patent application with respect to the process claims. Jack Staas ("Staas") was the Staas and Halsey attorney primarily responsible for this prosecution. On April 7, 1978, Rockwell filed a divisional application seeking a patent for the process

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims. This application issued as the '098 patent on January 11, 1983. It expired on January 11, 2000.

B. Alleged Prior Art

**\*2** In 1957, Thomas R. Scott obtained patents from Japan (the "Japanese Scott patent") and the United Kingdom (the "UK Scott patent"). Spectra and Opto allege that the UK Scott patent came to the attention of Rockwell's in-house patent attorneys while Rockwell was prosecuting the Manasevit process patent application in Great Britain. In response to that application, the UK Patent Office identified the UK Scott patent and five other prior art references. The UK Patent Office directed Rockwell's attention to those references.

Rockwell's UK patent counsel informed Rockwell's in-house patent counsel Robert Rogers ("Rogers") of the UK Scott patent and the five other references on September 29, 1972. In response to the UK patent counsel's request on how to respond to that information, Rockwell employee Martin E. Gerry prepared detailed instructions for amending Rockwell's claims to avoid the cited references. The UK patent counsel subsequently informed Rogers that it was removing from the application the original prior art cited in the application because the UK Scott patent and the other references constituted "the closest prior art."

Rockwell also applied for a Japanese patent on Manasevit's invention. On that application, Rockwell listed Frederick Hamann ("Hamann") as its representative. Hamann supervised Rockwell's in-house patent department from 1970 to 1995. As in the prosecution of the UK patent application, Scott's work was cited against the Japanese patent application.

On June 18, 1974, the Japanese patent office issued a rejection against the pending claims in Rockwell's Japanese patent application . [FN1] Rockwell's Japanese patent counsel sent the rejection to Hamann on July 6, 1974, along with a discussion of the Japanese Scott patent. The Japanese counsel also sent Hamann a copy of this patent. Rockwell's in-house patent counsel G. Donald Weber ("Weber") responded by asking for an English abstract of the Japanese Scott patent. The

Japanese patent counsel complied on August 8, 1974. Weber subsequently sent them instructions on how to amend Rockwell's Japanese claims in light of the Scott patent.

> FN1. Spectra and Opto allege that the claims in Rockwell's Japanese patent application were substantively the same as the claims in the '098 patent.

C. Procedural History

On August 30, 1993, Rockwell brought an action against the United States in the United States Court of Federal Claims. In May 1995, Rockwell initiated an action against Spectra in the Northern District of California. Spectra then intervened in the Court of Federal Claims action as a third-party defendant. The Northern District of California stayed its action pending a resolution of that action.

In 1998, the United States and Rockwell settled. This settlement deprived the Claims Court of jurisdiction over the dispute between Rockwell and Spectra. Thus, on January 13, 1999, the Northern District of California court lifted its stay and reopened the matter. On July 24, 2001, the court denied Rockwell's motion for partial summary judgment on the issue of inequitable conduct.

Rockwell brought the present infringement action on June 16, 2000.

IV. DISCUSSION

**\*3** Spectra and Opto assert that the inventor, Dr. Harold M. Manasevit, and Rockwell's attorney Jack Staas were guilty of inequitable conduct by failing to disclose material references to the PTO. [FN2]

> FN2. Spectra and Opto deny basing their inequitable conduct claims on the Rule 132 Declaration that Manasevit filed with the PTO (the "Manasevit Declaration") Further, in their opposition papers, Spectra and Opto state that they do not oppose the portion of Rockwell's summary judgment motion directed to the Manasevit Declaration. Likewise, they deny

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 531555 (D.Del.)
**(Cite as: 2002 WL 531555 (D.Del.))**

alleging that Rockwell itself, as a corporate entity, could be liable for inequitable conduct. Accordingly, it is undisputed that only Manasevit's and counsel for Rockwell's conduct is at issue.

As an initial matter, Rockwell argues for the first time in its reply brief that Spectra and Opto failed to plead inequitable conduct with particularity in their answer to the complaint and have thus waived their right to assert this affirmative defense. However, Rockwell's tactic of reserving new arguments for its reply brief amounts to impermissible "sandbagging." *See Jordan v. Bellinger,* 2000 U.S. Dist. LEXIS 19233, *18 (D. Del. April 28, 2000) (declining to address new arguments reserved for the reply brief); *see also* D. DEL. L.R. 7.1.3(c)(2) (1995). Accordingly, the court declines to address Rockwell's arguments on this issue and will turn instead to the substantive merits of the motion.

Patent applicants and their legal representatives have a duty to prosecute applications with candor, good faith, and honesty. *See Molins PLC v. Textrom, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir.1995). Breach of this duty can lead to a finding that the applicant engaged in inequitable conduct before the PTO. *See Life Tech., Inc. v. Clontech Lab., Inc.,* 224 F.3d 1320, 1324 (Fed.Cir.2000). The effect of such inequitable conduct is to render the affected patent unenforceable. *See id.*

In order to prove inequitable conduct, the defendants bear the burden of providing clear and convincing evidence that: (1) omitted or false information was material; (2) the applicant had knowledge of the existence and material nature of the information; and (3) the applicant intended to deceive the PTO. *See Molins,* 48 F.3d at 1178. "Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence." *Life Tech,* 224 F.3d at 1324. Information is considered material "when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Molins,* 48 F.3d at 1179. The court may infer intent from the facts and circumstances surrounding the applicant's overall conduct. *See Merck & Co. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418,

1422 (Fed.Cir.1989). However, in making its inferences, the court must be aware that "[a]lthough the intent element of fraud or inequitable conduct may be proven by a showing of acts the natural consequence of which were presumably intended by the actor, this requires the fact finders to evaluate all the facts and circumstances in each case. Such an evaluation is rarely enabled in summary proceedings." *KangaROOS U.S.A., Inc. v. Caldor, Inc.,* 778 F.2d 1571, 1577 (Fed.Cir.1985) (citation omitted).

In its moving papers, Rockwell declines to address the materiality of the Scott references. The Scott patents, however, were cited by foreign patent offices against Manasevit's process. This raises at least an inference that the references are material. *See Molins,* 48 F.3d at 1180. Further, Rockwell amended the claims in its foreign patents to overcome the Scott references. Accordingly the court finds that there is a triable issue of fact with regard to the materiality of the Scott patents.

*4 The court likewise concludes that granting summary judgment on the issue of intent would be improvident. Rockwell submits that Manasevit and Staas have each stated that they were unaware of the Scott patents. The Federal Circuit has stated, however, that "[f]ailure to cite to the PTO a material reference cited elsewhere in the world justifies a strong inference that the withholding was intentional." *Molins,* 48 F.3d at 1182. Moreover, the court expresses concern over Rockwell's argument that the named inventor of the '098 patent, who is also the named inventor of the British and Japanese patents that were amended in light of the Scott patents, was not aware of the Scott patents.

When faced with a similar motion for summary judgment based on inequitable conduct with regard to these parties, the District Court for the Northern District of California explicitly reserved judgment on whether the actions of Staas and his fellow Rockwell attorneys were inequitable. [FN3] *See Rockwell v. SDL, Inc.,* No. C-95-1729, at 12, n. 11 (N.D.Cal. July 24, 2000). That court further expressed a concern identical to that which the court has in the present case arising from Manasevit's failure to disclose the Scott patents to the PTO.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 4
Not Reported in F.Supp.2d, 2002 WL 531555 (D.Del.)
**(Cite as: 2002 WL 531555 (D.Del.))**

FN3. Based on the California court's denial of summary judgment on a similar issue, Spectra and Opto argue that Rockwell is now collaterally estopped from further litigating this issue. The court must disagree because a determination that there remain genuine issues of material fact is not a "final decision." *See Johnson v. Jones,* 515 U.S. 304, 313 (1995); *see also Whitford v. Boglino,* 63 F.3d 527, 530 (7th Cir.1995) (stating that the denial of summary judgment is not a final judgment, but rather an interlocutory order in the *res judicata* context.)

While mindful of the heavy burden the defendants bear, the court is persuaded that there remain substantial questions regarding Manasevit's and Staas's knowledge and intent that are better left to trial. *See Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1566 (Fed.Cir.1988) (noting that, "[i]f the facts of materiality or intent are reasonably disputed the issue is not amenable to summary disposition.")

Finally, Rockwell requests leave to file a further motion for summary judgment on inequitable conduct. Rockwell contends that this is appropriate because it was waiting for Spectra's and Opto's expert reports assessing the materiality of additional prior art references that were allegedly not disclosed to the PTO. However, as Spectra and Opto argue, the references at issue are articles that Manasevit himself wrote. Manasevit's and Rockwell's own experts were surely capable of assessing the materiality of Manasevit's work. Accordingly, the court declines to grant Rockwell additional time to file a motion that could have been filed with the instant motion for summary judgment.

V. CONCLUSION

The parties do not dispute that the corporate entity Rockwell is not being accused of inequitable conduct. Nor do they dispute that the charges of inequitable conduct are not based on the Manasevit Declaration. Thus, the court will grant Rockwell's motion with regard to these issues. However, there remain genuine issues of material fact with regard to the remaining inequitable conduct allegations.

For these reasons, IT IS HEREBY ORDERED that:
 1. Rockwell's motion for partial summary judgment (D.I.149) is GRANTED in part and DENIED in part.
 2. Rockwell's request to file a further motion for summary judgment on inequitable conduct (D.I.149) is DENIED.

Not Reported in F.Supp.2d, 2002 WL 531555 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:00CV00589 (Docket)

(Jun. 19, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on October 3, 2005, I electronically filed this Pleading with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Sheldon N. Sandler, Esquire
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
SSandler@ycst.com

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQUIRE**

cc:    Mr. Robert I. Hicks

Hicks \ Briefs \ Stay AB.final

26